IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CYNTHIA AYERS,**                                       Case Number 5:13cv1437

    Plaintiff,

    v.                                                Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                 MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Cynthia Ayers seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income ("SSI") benefits. The district court has jurisdiction under 42 U.S.C. § 405(g) and 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI on March 8, 2010, and alleged a disability onset date of January 28, 2010. (Tr. 12, 159). Her claims were denied initially (Tr. 114) and on reconsideration (Tr. 118). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 125). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 8, 29). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On July 1, 2013, Plaintiff filed the instant case. (Doc. 1).

Prior to the instant case, Plaintiff filed for SSI on November 9, 2007, and alleged a disability onset date of November 5, 2007. (Tr. 64). On January 27, 2010, an ALJ found Plaintiff was not disabled and restricted her to a range of medium work. (Tr. 69). Finding there was new and material evidence in the record, the ALJ in the instant case determined she was not bound by the prior ALJ decision (Tr. 64). (Tr. 12). *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997); *see also* Acquiescence Ruling 98-4(6).

## FACTUAL BACKGROUND

*Personal and Vocational History*

Born May 27, 1966, Plaintiff was 43 years old on the date her application was filed. (Tr. 22). Plaintiff has a high school education, no past relevant work experience, and received special education services. (Tr. 22-23).

Plaintiff lived alone in an apartment where she cooked, cleaned, and did laundry without assistance, although Plaintiff's mom helped with grocery shopping. (Tr. 49-50). Concerning daily activities, Plaintiff ate breakfast, took medication, visited with family or friends in her apartment, checked the mail, and watched television or movies. (Tr. 51-52).

The ALJ's discussion of Plaintiff's medical history, hearing testimony, and background is an accurate and thorough reflection of the record and is fully incorporated herein, as follows:

> In written statements, submitted in support of her application, the claimant alleged that her ability to work is limited by bipolar disorder, anxiety and depression (Ex. 4E). She reported worsening of her depression in April 2010 and associated lack of motivation and difficulty being around other people (Ex. 7E). In a Disability Report submitted on October 20, 2010 the claimant reported feeling fatigued and socially isolated due to her mental impairments and indicated that she had lost eight pounds within the past month (Ex. 8E).
>
> The claimant was asked by her representative to describe her symptoms of anxiety and depression during the November 6, 2011 hearing. She testified that she experiences anxiety or panic attacks characterized by chest pain, difficulty breathing and numbness of her left side. She first indicated that she has such

attacks weekly, then stated that they occur three to four times per week. When asked how long these attacks persist, the claimant testified that the longest was two hours. She stated that while experiencing a panic or anxiety attack, she "blocks out the work" and "thinks happy thoughts." However, she testified that in the past she has required emergency room treatment for anxiety attacks. She said her previous work attempts failed due to her inability to keep up. The claimant testified inconsistently regarding the impact of her impairments on her ability to sleep. She indicated that, prior to being prescribed medications she would not sleep for up to a week at a time. She stated that, while she takes the medication Trazodone for sleep, she takes the medication only occasionally and sleeps approximately two hours per night.

\* \* \*

The claimant's earnings records reflect a history of sporadic work and annual earnings well below those which would represent substantial gainful activity (Ex. 4D; 7D). . . .

In terms of the claimant's alleged mental impairments, progress notes of examining and treating mental health professionals do not reflect the claimant's report of symptoms consistent with those which the claimant reported in connection with her application for benefits. While the claimant indicated during an office visit with her physician on March 17, 2010 that she experienced anxiety, depression, inability to concentrate and insomnia, she indicated that these symptoms were "managed fairly well with medication." (Ex. 4F, p. 6). Progress notes of the claimant's counselor between April 2010 and January 2011 reflect the claimant's discussion of stressors including her relationship with her boyfriend, attempts to find employment, housing issues and her daughter's incarceration, but do not mention the claimant's lack of sleep or appetite, diminished motivation or experience of panic attacks. While severe anxiety was noted during sessions on June 30, 2010 and January 5, 2011, a session following the claimant's appearance in court, the claimant's symptoms of agitation, depression and anxiety were generally noted to be only mild or moderate in severity (Ex. 6F, pp. 4-11; 8F, pp. 9, 20, 24). A progress summary for the period from June 24, 2010 to September 24, 2010 specifically indicated that the claimant was better able to control her anxiety and was able to "avoid panic episodes" (Ex. 8F, p. 5). During a November 2010 psychiatric evaluation, the claimant reported that her sleep and appetite were "ok," but indicated that she experienced episodes of low motivation, self isolation, loss of appetite and sleep (Ex. 8F, p. 12). There is no indication that the claimant reported symptoms to treatment providers during the period for adjudication consistent with those she alleged during the hearing of this matter.

The claimant's treatment seeking during the period for adjudication is also inconsistent with her allegations as to the severity of her psychological impairments. During significant periods since the alleged onset of disability, the claimant has not sought specialized mental health treatment. The claimant reported to her primary care physician in March 2011 that she had not seen her counselor in two months (Ex. 4F, p. 3). The claimant attended counseling sessions

at the Counseling Center of Wayne and Holmes Counties (the Counseling Center) with some regularity from April 2010 to January 2011 (Ex. 6F, pp. 4-11; 8F, pp. 9, 20, 24), but cancelled or failed to appear for all subsequently scheduled appointments (Ex. 8F, pp. 6-8, 10-14, 18, 21-23, 25; 11F, pp. 5-7). The claimant was discharged from the care of the Counseling Center on June 29, 2011, after not being seen since January 5, 2011 (Ex. 11F, p. 2). The claimant no longer sought specialized mental health treatment, but continued to receive psychotropic medications through her primary care physician (Ex. 4F; 12F). The claimant's primary care physician did not note her complaints associated with depression or anxiety between March 2010, when she indicated her symptoms were controlled with medication (Ex. 4F, p. 6), and August 18, 2011, when she reported increased depression following her arrest for public intoxication at an Indianapolis NASCAR event (Ex. 12F, p. 4).

Clinical findings associated with the claimant's depression, bipolar disorder and anxiety were only sporadically noted by treatment providers during the period for adjudication. Psychiatrist Vera Astreika, M.D. conducted an initial evaluation of the claimant in connection with her care at the Counseling Center on November 12, 2010 (Ex. 8F, pp. 15-18). The claimant rated her mood as "three" on a scale from one to ten wherein ten represents "happiest," but reported that she can be happy depending on the situation and that her appetite and sleep were "ok." The claimant reported a twenty year history of anxiety and depressive symptoms characterized by episodes of low motivation, self isolation, loss of appetite and sleep. On examination, Dr. Astreika observed the claimant to be fairly cooperative and maintain normal eye contact. Her speech was normal in rate and flow. The claimant's concentration and memory were described as "ok" and her intelligence "average." The claimant exhibited a euthymic mood and full affective range. He denied suicidal or homicidal ideation. Dr. Astreika indicated that the claimant demonstrated logical and organized thought process with no evidence of delusions or hallucinations. Based on her examination, Dr. Astreika diagnosed the claimant with major depressive disorder, in remission, and offered a Global Assessment of Functioning (GAF) of between 50 and 60, indicative of moderate symptoms or functional impairment. Dr. Astreika recommended that the claimant continue with her prescribed Celexa and Clonazepam and return for follow up in one month.

As noted above, the progress notes of the claimant's counselor generally indicated that the claimant experienced mild to moderate anxiety, depression and agitation, with isolated episodes of severe anxiety. Clinical findings associated with the claimant's psychological impairments were generally not reflected in treatment notes. The clamant was regularly noted to exhibit good or fair appearance, hygiene, grooming and judgment without hallucinations, delusions or orientation deficit (Ex. 6F, pp. 4-11; 8F, pp. 9, 20, 24). During the claimant's final counseling session on January 5, 2011 the claimant was appreciated to be fidgety with slightly pressured speech which was at times hesitant and low (Ex. 8F, p. 9). As these clinical findings were not noted during any other session, the undersigned is forced to conclude that they were isolated and noted due to their variance from the

4

claimant's ordinary presentation. The undersigned further notes that this session took place following the claimant's appearance in court. The claimant's conservative treatment during the period for adjudication is further inconsistent with her allegations as to the severity of her impairments. The claimant reported that her prescribed medications, Celexa and Klonopin, were effective in controlling her psychologically based symptoms as early as March 17, 2010 (Ex. 4F, p. 3). She was maintained on this medication regimen until August 18, 2011, when she expressed concern regarding withdrawal symptoms from Klonopin to her primary care physician, and she was prescribed Lithium instead (Ex. 12F, pp. 4-5). In September 2011, the claimant reported that she had successfully weaned herself from Celexa and Klonopin and found that she was calmer with prescribed Lithium (Ex. 12F, pp. 2-3). The claimant's reports to her treating physician suggest that the symptoms of her mental impairments are adequately controlled with medication. While she reported headaches to be associated with her Lithium use, she specifically requested that the medication be continued, an indication that these headaches are not particularly severe or bothersome (Ex. 12F, pp. 2-3). The claimant has not required emergency room treatment or psychiatric hospitalization at any time during the period for adjudication.

The undersigned notes that no mental health treatment provider involved in the claimant's treatment provided an opinion as to the claimant's residual functional capacity. The undersigned has considered the opinions of mental health professionals who examined the claimant or reviewed his case file at the request of governmental agencies and the Bureau of Disability Determination (BDD). Laurel Smith, Psy.D. performed a consultative psychological examination of the claimant at the request of the Social Security Disability counselor of a Department of Job and Family Services office to "clarify the nature of her psychological problems, to re-establish a diagnosis in order to evaluate whether she is psychologically able to work" (Ex. 5F, pp. 8-12). The claimant reported that a high level of stress, depressive symptoms and "personality issues" made her unable to work.

On examination, Dr. Smith found the claimant to be alert, self conscious and nervous. She was oriented to person, place and time. The claimant indicated that she gets depressed, but was not suicidal. She described the symptoms of her bipolar disorder as mood swings, "every other day." While the claimant was emotionally distant, according to Dr. Smith, she was able to establish fair rapport. Dr. Smith observed the claimant to display good motivation, but inefficiency with work tasks due to distraction and disorganization. The claimant reported numerous stressors related to her internal adjustment, family relationships, work functioning and marriage. Dr. Smith described the claimant's mood as "somewhat anxious, pessimistic and depressed and her affect was inappropriate, labile and restricted in range." The claimant's "attention tended to be inconsistent, rigidly directed and easily disrupted, and deficits were apparent in recent memory." Dr. Smith observed no autonomic or psychomotor indications of anxiety or depression and specifically indicated that the claimant's motor activity was

> normal. She characterized the claimant's thought process as circumstantial, tangential, confused and disorganized and noted thought content to include obsessive thoughts and suspiciousness.
>
> Dr. Smith administered a portion of the Wechsler Adult Intelligence Scale, 3rd edition, (WAIS-III) to the claimant and recorded her verbal IQ of 66. While Dr. Smith noted that this result was consistent with prior testing, she indicated that it was likely a significant underestimate of the claimant's capacity due to "interference from non-intellectual factors." The factors included the claimant's anxiety. Dr. Smith estimated the claimant's true cognitive functioning to be in the borderline range. Dr. Smith also administered the Millon Clinical Multiaxial Inventory to the claimant, but noted that her responses were invalid and indicative of random scoring. Based on her examination, Dr. Smith concluded that diagnoses of dysthymic disorder and personality disorder, not otherwise specified, were appropriate. No diagnosis related to the claimant's intellectual functioning, including mental retardation or borderline intellectual functioning, was offered. Dr. Smith offered a Global Assessment of Functioning (GAF) of 48, consistent with serious symptoms of functional impairment. Dr. Smith recommended that the claimant pursue outpatient psychiatric evaluation and treatment. While she suggested no specific work-related limitations due to the claimant's psychological impairments, she indicated that the claimant should be considered "psychologically disabled."
>
> Dr. Smith completed a Mental Functional Capacity Assessment form directed to the Ohio Department of Job and Family Services on March 18, 2010. Dr. Smith's assessment indicated that the claimant had moderate limitations in most aspects of work-related functioning. However, Dr. Smith identified marked impairment of the claimant's abilities to understand and remember detailed instructions, complete a normal workday or work week without interruption from her psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods and accept instructions and respond appropriately to criticism from supervisors. Dr. Smith further concluded that the claimant would be unemployable for a period of twelve months or more. (Ex. 5F, p. 7).

\* \* \*

> Karen Terry, Ph.D. reviewed the claimant's case file at the request of the BDD on April 29, 2010 (Ex. 3A). Dr. Terry concluded, based on the claimant's reports to her primary care physician, that the claimant's psychological condition had not worsened since the January 27, 2010 Administrative Law Judge's decision on the claimant's prior application for benefits. Therefore, Dr. Terry adopted the residual functional capacity set forth in that decision pursuant to Acquiescence Ruling 98-4. Dr. Terry's assessment is generally consistent with the evidence as a whole and was given great weight.

(Tr. 18-22).

6

*ALJ Decision*

The ALJ found Plaintiff had severe impairments including generalized anxiety disorder, bipolar disorder, borderline intellectual functioning, and major depressive disorder and ruled out personality disorder. (Tr. 14). The ALJ then concluded Plaintiff did not meet or medically equal any listed impairment, including listing 12.05. (Tr. 15-16). The ALJ found Plaintiff did not meet the listing because there were no valid I.Q. scores in the record which suggest mental retardation. (Tr. 15). Based on Plaintiff's impairments and the record, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with certain nonexertional limitations. (Tr. 17). Then, after considering Plaintiff's age, education, work experience, and RFC, as well as VE testimony, the ALJ found jobs exist in significant numbers in the national economy that Plaintiff could perform. (Tr. 23). Therefore, the ALJ determined Plaintiff was not disabled. (Tr. 24).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court

7

cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id*. The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

8

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred by finding she did not meet or medically equal listing 12.05(C) and the ALJ improperly evaluated Dr. Smith's opinion. (Doc. 13, at 12, 18). Each argument is addressed in turn.

*Listing 12.05(C)*

To demonstrate intellectual disability, formerly termed mental retardation, a claimant must establish three factors to satisfy the diagnostic description: 1) subaverage intellectual functioning; 2) onset before age twenty-two; and 3) adaptive-skills limitations. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Beyond these three factors, a claimant must also satisfy "any one of the four sets of criteria" in listing 12.05. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). Pertinent here, 12.05(C) requires that a claimant have a valid, verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, § 12.05(C).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). However, a reviewing court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6; *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his

9

decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

Here, the ALJ found Plaintiff did not have a valid verbal, performance, of full-scale I.Q. score of 60 through 70. (Tr. 15). In contention, Plaintiff argues the ALJ improperly discredited Dr. Smith's assessment that Plaintiff had a verbal scale I.Q. score of 66. (Doc. 13, at 15-17).

Contrary to Plaintiff's position, the ALJ did not err by finding Dr. Smith's I.Q. assessment invalid. As the ALJ noted, Dr. Smith questioned the I.Q. score and believed it was a poor measure of Plaintiff's actual capacity. (Doc. 16, at 16); (Tr. 428). Specifically, Dr. Smith wrote:

> On a partial administration of the WAIS-III [Plaintiff] achieved a Verbal Scale IQ of 66 (1st percentile), placing her within the Mild Mental Retardation range of intellectual functioning. The test results are consistent with her previous testing which was considered a rather poor measure of best current functioning and a significant underestimate of capacity because of interference from nonintellectual factors. . . . If the interference could be eliminated, it is estimated that [Plaintiff] would be capable of functioning with the Borderline range.

(Tr. 428-29).

As stated by Dr. Smith, the I.Q. assessment was only partially administered. Further, the test's validity was called into question by Dr. Smith as a "significant underestimate" of Plaintiff's capacity. (Tr. 428). Moreover, Dr. Smith was sufficiently specific in finding Plaintiff functioned at the borderline intellectual level, not the mentally retarded level. (Tr. 428-29); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003) (The ALJ acknowledged claimant's WAIS I.Q. score of 67 but determined she was not mentally retarded because the treatment provider concluded she functioned at a level exceeding her test score).

Regarding the diagnostic criteria, Plaintiff claims evidence that she received special education services and had first grade I.Q. scores of 76, 78, and 79 collectively demonstrate deficits in adaptive functioning manifested prior to the age of 22. (Doc. 13, at 14).

However, the ALJ properly considered this evidence but found it did not show intellectual limitations resulting in deficits of adaptive functioning. Indeed, the ALJ considered Plaintiff's first grade I.Q. scores but found they were consistent with borderline intellectual functioning. (Tr. 15). Regarding special education, the ALJ found Plaintiff's placement in mainstream classes for 80% of the time and an IEP goal to acquire work experience belied subaverage general intellectual functioning before age 22. (Tr. 15-16). Indeed, the Sixth Circuit "has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009).

Further, Dr. Dallara found Plaintiff had I.Q. scores of 71, 75, and 71 and also concluded Plaintiff's symptoms were indicative of borderline intellectual functioning and not mental retardation. (Doc. 16, at 16); (Tr. 517-20). The ALJ also correctly concluded there was no diagnosis of mental retardation in the record. (Tr. 15, 20). Last, as more fully discussed below, substantial evidence supports finding less than significant deficits in adaptive functioning, including that Plaintiff lived alone in an apartment and spent time with family friends. (Doc. 16, at 17).

In sum, the ALJ's finding, that Plaintiff does not meet listing 12.05C, is supported by substantial evidence, and for this reason, Plaintiff's argument to the contrary is not well-taken.

11

*Treating Physician Rule*

Next, Plaintiff objects to the ALJ's treatment of Dr. Smith's opinion. (Doc. 13, at 18). Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Last, "the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp. 2d 813, 823-24 (S.D. Ohio 2011). This is because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; §

12

416.927(c), (d); SSR 96–6p, 1996 WL 374180, at *2–3. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F.Supp. 2d at 823-24.

Importantly, the ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (*quoting* SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (*citing Rogers*, 486 F.3d at 243). Accordingly, failure to give good reasons requires remand. *Id*. at 409–410.

Plaintiff's argument, that the ALJ did not provide good reasons for affording no weight to Dr. Smith's opinion, is not well-taken because the ALJ properly considered several regulatory factors. (Doc. 13, at 18-19). *Rabbers*, 582 F.3d at 660; *Douglas*, 832 F.Supp. 2d at 823-24 ("opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.").

Indeed, the ALJ considered Dr. Smith's treatment relationship with Plaintiff, finding Dr. Smith only examined Plaintiff on one occasion during the relevant adjudicatory period. (Tr. 22). Moreover, the ALJ commented on the supportability of the opinion, noting the restrictive opinion was inconsistent with notes that Plaintiff "managed fairly well with medication" and that

13

on examination, Plaintiff was alert and cooperative, had a normal mood and affect, and appropriate judgment and insight. (Tr. 22). The ALJ also indicated Dr. Smith's opinion was inconsistent with the notes of Plaintiff's treating counselor, who suggested Plaintiff only rarely exhibited or reported severe symptoms of anxiety and generally described her symptoms as mild to moderate in severity. (Tr. 22). Similarly, the ALJ found Dr. Smith's marked limitations in specific areas of work-related function were inconsistent with the evidence as a whole and the observations of Plaintiff's treatment providers. (Tr. 22). Moreover, the ALJ properly afforded no weight to Dr. Smith's opinion that Plaintiff was "unemployable" or "psychologically disabled" because those are conclusions reserved solely to the Commissioner. 20 C.F.R. § 404.1527(d)(2). In short, the ALJ provided good reasons to discount Dr. Smith's opinion.

What is more, the ALJ's decision is supported by substantial evidence. (*See*, Doc. 16, at 18-19). In brief, the ALJ supported her decision with the following: reference to treatment records of Plaintiff's counselor, Dr. Wykoff, at the Counseling center, which indicated Plaintiff's symptoms were generally mild to moderate in severity (Tr. 19, 436-37, 442, 456, 467); Plaintiff's activities of daily living, including that she independently lived in and maintained her apartment, visited with family and friends, and watched television and movies (Tr. 22, 51-52); Plaintiff's conservative and sporadic treatment history (Tr. 20, 434-36, 439-40, 442, 451-52, 467, 471); generally situational stressors (Tr. 22); and the absence of an RFC opinion from any treatment provider (Tr. 20). For these reasons, the ALJ's RFC determination is supported by substantial evidence.

To the extent Plaintiff argues there is evidence in the record which would support a different result, that argument is not well-taken as it would require the Court to go outside the

14

requisite scope of review. *Jones*, 336 F.3d at 477 (6th Cir. 2003) (the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ.").

In sum, the ALJ considered several of the required regulatory factors as part of her decision to afford Dr. Smith's opinion no weight, including supportability, consistency, and treating relationship. Further, her decision is supported by substantial evidence. Therefore, the ALJ did not err in her treatment of Dr. Smith's opinion.

Next, Plaintiff summarily expresses concern that state agency physician Dr. Terry did not have the benefit of reviewing Dr. Smith's report and corresponding I.Q. scores or school records submitted after the hearing, and therefore, Dr. Terry's report cannot amount to substantial evidence. (Doc. 13, at 19). Plaintiff failed to provide any legal support for this argument.

As stated above, the ALJ considered all relevant evidence then found the state agency opinions supported the RFC. (Tr. 9-24). Therefore, the ALJ did not err. *Curry v. Colvin*, 2013 WL 5774028, at *17, *19 (N.D. Ohio); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009) (an ALJ must consider all relevant evidence and provide good reasons for the weight afforded to opinion evidence). Moreover, Dr. Chambly reviewed Plaintiff's case on reconsideration (including the updated record) but found Dr. Smith's opinion inconsistent with the medical evidence of record and gave it no weight. (Tr. 104-05, 107). Accordingly, Plaintiff's argument with respect to Dr. Terry is not well-taken.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI benefits applied the correct legal standards and is supported by substantial evidence. Accordingly, the decision of the Commissioner is affirmed.

                                                      s/James R. Knepp, II
                                                      United States Magistrate Judge